OPINION OF THE COURT
Andrew M. Engel, J.
The defendant is charged with driving while intoxicated, in violation of Vehicle and Traffic Law § 1192 (3).
Pursuant to an order of this court (Engel, J.) dated November 21, 2013, on February 7, 2014 this court conducted a Mapp/ Dunaway/Huntley[1] hearing. At such a hearing, where a defendant challenges the legality of a search and seizure, along with statements allegedly obtained as a result thereof, the People have the burden of going forward, in the first instance, to establish the legality of the police conduct. (People v Malinsky, 15 NY2d 86 [1965]; People v Wise, 46 NY2d 321 [1978]; People v Dodt, 61 NY2d 408 [1984]; People v Moses, 32 AD3d 866 [2d Dept 2006], lv denied 7 NY3d 927 [2006].) Once the prosecution has met this burden, the defendant has the ultimate burden of establishing the illegality of the police conduct, by a fair preponderance of the evidence. (People v Berrios, 28 NY2d 361 [1971]; People v Di Stefano, 38 NY2d 640 [1976]; People v Lombardi, 18 AD2d 177 [2d Dept 1963].) Additionally, the People have the burden of proving the voluntariness of any statements allegedly made beyond a reasonable doubt (People v Valerius, 31 NY2d 51 [1972]; People v Anderson, 42 NY2d 35 [1977]), and, where applicable, that the defendant was adequately advised of his rights and that he made a knowing and intelligent waiver of same. (People v Love, 85 AD2d 799 [3d Dept 1981], affd 57 NY2d 998 [1982]; People v Woods, 89 AD2d 1022 [2d Dept 1982]; People v Shields, 125 AD2d 863 [3d Dept 1986], lv denied 69 NY2d 955 [1987].)
The People attempt to meet their burden through the testimony of Police Officers Thomas Gryski and James Quigley. The defendant did not call any witnesses. After listening to the witnesses and judging their demeanor, the court makes the following findings of fact, based upon the credible evidence:
On May 1, 2013, at approximately 2:45 p.m. Officer Gryski was on patrol, alone in a marked police vehicle, when he *695 received a radio call concerning a possible domestic incident on Northern Boulevard in East Norwich. Officer Gryski responded to the reported location, which was the parking lot of a Chase Bank on Northern Boulevard.
Upon arrival Officer Gryski observed a male and female, who were together, and another male, who claimed to be a witness. Officer Gryski then spoke to the witness and the other male, who the officer identified as the defendant, separately. The witness told Officer Gryski that he was in his vehicle, at the intersection of Northern Boulevard and Route 106, where he saw the defendant and the woman with the defendant in a heated argument in their car and became concerned. The witness then followed the defendant as the defendant drove on Northern Boulevard; and, then the defendant followed the witness into the Chase Bank parking lot. The witness further advised Officer Gryski that he first engaged the defendant in conversation and then called 911.
Officer Gryski then spoke with the defendant, who was in the Chase Bank parking lot in the vicinity of the defendant’s vehicle. At that time he observed the defendant to appear disheveled, to have glassy bloodshot eyes, to have slurred speech, to be unsteady on his feet and to have the odor of an alcoholic beverage about him. Officer Gryski asked the defendant if he was driving, where he was coming from and if he had been drinking. Defendant responded that he had a couple of beers at a bar in Huntington with the woman who was present, that they argued there and then drove westbound on Northern Boulevard.
Following this conversation Officer Gryski had the defendant perform standardized field sobriety tests (SFSTs), which yielded positive clues for alcohol consumption and being under the influence of alcohol. The officer then had the defendant submit to a preliminary breath test, which resulted in a reading of a blood alcohol concentration of greater than .10 of one percent, indicative of intoxication.
Following these tests the defendant was placed under arrest and transported to the Central Testing Section (CTS) of the Nassau County Police Department. At approximately 5:00 p.m., at CTS, Officer Quigley began conducting a 20 minute observation of the defendant, preliminary to conducting a chemical test. Just before this observation period began, without being asked any questions, the defendant stated, “He screamed at me and told me to pull over.” At 5:09 p.m., during the observation period, again, although not asked any questions, the defendant *696 stated, “I know I am getting a DWI, but that guy should be getting something for impersonating a cop. The DWI is going to stick, I’m sure. Give me a DWI, I hope this guy gets it.” At 5:10 p.m. the defendant volunteered, “What I blew, it is what I blew. He screamed at me and told me to pull over.” At 5:17 p.m., still during the 20 minute observation period, and again without being questioned, the defendant blurted out, “Fuck, fucking bullshit. That guy’s an asshole.”
Following the 20 minute observation period the defendant requested to speak with his attorney. The defendant was afforded that opportunity, with Officer Quigley standing nearby. Officer Quigley made no effort to move out of earshot of the defendant’s conversation with his attorney and made no effort to find the defendant a place where he could have a private conversation with his attorney.
While speaking with his attorney, at 5:41 p.m. the defendant stated, “I was at a light with my girlfriend having a fight, we were out from the night before. I think I did all the tests right. I blew. I know I probably shouldn’t have blown.” At 5:44 p.m. the defendant stated, “Last twenty four hours? Oh, beer with occasional shots of tequila.” At 5:47 p.m. the defendant stated, “If it was what I did in the last three hours, I would pass, but last twenty four hours, I wouldn’t. I drank all night.”
Statements on Scene
Upon responding to the scene of a possible domestic incident, received by radio communication regarding same, and after speaking with the witness who reported the alleged incident, Officer Gryski, at the very least, possessed an “objective, credible reason, not necessarily indicative of criminality” (People v Hollman, 79 NY2d 181, 184, [1992]; see also People v De Bour, 40 NY2d 210 [1976]; People v Hira, 32 Misc 3d 129[A], 2011 NY Slip Op 51298[U] [App Term, 2d Dept, 9th & 10th Jud Dists 2011]) permitting him to lawfully approach the defendant and request information. Thereafter, observing the defendant to be disheveled, to have glassy bloodshot eyes, to have slurred speech, to be unsteady on his feet and to have the odor of an alcoholic beverage about him, coupled with the information provided by the witness, Officer Gryski had a reasonable suspicion to believe that the defendant had committed a crime. (See People v Smith, 2002 NY Slip Op 40418[U] [App Term, 2d Dept, 9th & 10th Jud Dists 2002].) It was then appropriate for Officer Gryski to make further inquiry regarding the defendant’s operation of a motor *697 vehicle and his alcohol consumption and to ask him to perform SFSTs.
The defendant’s statement, that he had a couple of beers at a bar in Huntington with the woman who was present, that they argued there and then drove westbound on Northern Boulevard, was voluntarily made without any coercion or improper conduct on the part of Officer Gryski. Moreover, under all of the prevailing circumstances, “a reasonable man, innocent of any crime ... in the defendant’s position” (People v Yukl, 25 NY2d 585, 589 [1969]) would not have thought that he was in custody.
Thereafter, following the SFSTs, given the defendant’s admission of operation and alcohol consumption, Officer Gryski’s findings during the SFSTs, the positive preliminary breath test, and the observations of glassy bloodshot eyes, slurred speech, the odor of alcohol and the defendant’s unsteadiness on his feet, Officer Gryski had probable cause to believe the defendant was driving while intoxicated. (People v Blajeski, 125 AD2d 582 [2d Dept 1986]; People v Gingras, 22 Misc 3d 22 [App Term, 2d Dept, 9th & 10th Jud Dists 2008].)
Statements at CTS
There is no question that the defendant was in custody at the time he allegedly made statements at CTS. There is also no question that he was not advised of his Miranda rights prior to these statements being made. The question remains whether or not these statements were obtained as the result of an interrogation conducted by the police, or some other coercive or improper conduct on the part of the police. (People v Huffman, 41 NY2d 29 [1976]; People v Huntley, People v Guilford, 21 NY3d 205 [2013].)
The statements allegedly made by the defendant during the 20 minute observation being conducted by Officer Quigley were “spontaneous declaration^] which w[ere] in no way induced, provoked, or encouraged by the police.” (People v Taylor, 243 AD2d 741, 741 [2d Dept 1997].) These statements are properly admissible at the time of trial and shall not be suppressed. (See People v Lynes, 49 NY2d 286 [1980]; People v Rivers, 56 NY2d 476 [1982]; People v Williams, 262 AD2d 667 [2d Dept 1999].)
The subsequent statements attributed to the defendant, while on the telephone with his attorney, were not the product of any police interrogation, but provide a host of additional questions regarding the attorney-client privilege, the right to counsel and a subject’s recognized limited right to access to counsel prior to *698 submitting to a chemical test, which must be answered before the admissibility of these statements can be determined.
The facts on this point are clear: after being requested to submit to a chemical test of his breath, but prior to either refusing or consenting to submit to the test, the defendant requested to speak with his attorney. The defendant was afforded that opportunity, with the defendant handcuffed to the wall and Officer Quigley standing just a few feet away, where he could hear the defendant’s conversation with his attorney. No effort was made to provide the defendant with a place where he could have a private conversation with his attorney. While speaking with his attorney, in obvious response to his attorney’s questions, the defendant stated,
“I was at a light with my girlfriend having a fight, we were out from the night before. I think I did all the tests right. I blew. I know I probably shouldn’t have blown. Last twenty four hours? Oh, beer with occasional shots of tequila. If it was what I did in the last three hours, I would pass, but last twenty four hours, I wouldn’t. I drank all night.”
The question now presented is: may a police officer testify about conversations he overheard between a subject and the subject’s attorney, where the subject requested to speak with counsel before deciding whether or not to submit to a chemical test and where the officer made no effort to afford the subject privacy during that conversation?
CPLR 4503 (a) (1), codifying the common-law attorney-client privilege, provides, in pertinent part:
“Unless the client waives the privilege, an attorney or his or her employee, or any person who obtains without the knowledge of the client evidence of a confidential communication made between the attorney or his or her employee and the client in the course of professional employment, shall not disclose, or be allowed to disclose such communication, nor shall the client be compelled to disclose such communication, in any action, disciplinary trial or hearing, or administrative action, proceeding or hearing conducted by or on behalf of any state, municipal or local governmental agency or by the legislature or any committee or body thereof. Evidence of any such communication obtained by any such person, and evidence resulting therefrom, shall not be disclosed by any state, municipal or local *699 governmental agency or by the legislature or any committee or body thereof.”
Four basic elements of the privilege have been established:
“First, it is beyond dispute that no attorney-client privilege arises unless an attorney-client relationship has been established. Such a relationship arises only when one contacts an attorney in his capacity as such for the purpose of obtaining legal advice or services. Second, not all communications to an attorney are privileged. In order to make a valid claim of privilege, it must be shown that the information sought to be protected from disclosure was a ‘confidential communication’ made to the attorney for the purpose of obtaining legal advice or services. Third, the burden of proving each element of the privilege rests upon the party asserting it. Finally, even where the technical requirements of the privilege are satisfied, it may, nonetheless, yield in a proper case, where strong public policy requires disclosure.” (Matter of Priest v Hennessy, 51 NY2d 62, 68-69 [1980] [citations omitted]; see also People v Mitchell, 58 NY2d 368 [1983].)
There is no question in the matter sub judice that an attorney-client relationship had been established at the time the alleged statements were made while the defendant was on the telephone speaking with his attorney. The testimony is clear that following the 20 minute observation period conducted by Officer Quigley the defendant requested to speak with his attorney and was afforded that opportunity. (See People v Harris, 57 NY2d 335 [1982], cert denied 460 US 1047 [1983]; People v Cunningham, 49 NY2d 203 [1980].) There is no dispute that the statements in question were made during that conversation. There is similarly no question that the defendant sought to speak with his attorney for the purpose of obtaining legal advice.
It is well recognized that where a
“defendant, knowing third persons to be nearby, speaks in such a way as to indicate that he is not interested in keeping private what he says to his lawyer, the defendant himself has made the choice and his statements will not be considered ‘privileged’ or, more precisely, he will be deemed to have renounced his right to privacy of consultation.” (People v Cooper, 307 NY 253, 259 n 3 [1954]; see also People v Harris; Doe v Poe, 92 NY2d 864 [1998].)
*700 But what of a conversation between counsel and a defendant, where the defendant has no choice but to speak to counsel in the presence of a police officer?
Clearly, “if the communication was intended to be confidential, the fact that it may have been overheard by a third person does not necessarily destroy the privilege.” (People v Decina, 2 NY2d 133, 145 [1956] [citations omitted].) As that Court noted, “The true test appears to be whether in the light of all the surrounding circumstances, and particularly the occasion for the presence of the third person, the communication was intended to be confidential and complied with the other provisions of the statute.” (Id.)
People v Harris, where the defendant made an incriminating statement to her attorney, while speaking to him on the telephone, in the presence of a police officer, is readily distinguishable from the matter before this court. In Harris, after escorting the defendant to the telephone, in the defendant’s home, the officer was in the process of leaving the room when the defendant made the incriminating statement. Moreover, when this statement was made, the defendant’s house manager was also present. Clearly, the defendant therein did not intend her conversation with her attorney to be confidential. She had every opportunity to speak with her attorney without either the officer or the house manager present, but chose to speak in their presence.
In the matter before this court, as indicated hereinabove, the defendant was afforded no such opportunity. The defendant was handcuffed to a wall near the telephone; and, Officer Quigley made no effort to move himself to a position where he could not hear the defendant’s conversation with his attorney. As noted by the court, under similar circumstances, in People v Sanders (169 Misc 2d 813, 819 [Sup Ct, Bronx County 1996]), “The privilege had not been destroyed or waived because ‘the guard’s presence was ordered by command of the public authorities’. The surrounding circumstances were that the defendant was in custody and the third party’s presence was required by lawful authority” (citation omitted). In suppressing statements overheard by a police officer who was guarding the defendant, while the defendant was speaking with a treating physician, the court correctly recognized:
“where the presence of the third party who overheard the statements was required by law and was *701 absolute, the privilege cannot be said to have been waived by the officer’s presence.
“To allow this statement to be admitted into evidence would be to rule that a prisoner must forego his right against self-incrimination to obtain necessary medical diagnosis and treatment. To require the relinquishment of a constitutional right as a condition of medical diagnosis and treatment for persons placed under arrest or incarcerated would be unconscionable. ‘[T]o grant a privilege on which a defendant can rely, and then to dissolve it and use against the defendant the very matter the law guaranteed to protect, makes a mockery of justice.’ ” (Id. at 820, citing People v McHugh, 124 Misc 2d 823, 827 [Sup Ct, Bronx County 1984].)
The same must be true for a prisoner seeking to assert the attorney-client privilege, under the circumstances presented herein.
The court’s finding herein, that, under the circumstances presented, the defendant did not waive his otherwise privileged communication with his attorney notwithstanding, as the Fourth Department pointed out in People v O’Connor (85 AD2d 92, 97 [4th Dept 1982]), we should not “confuse[ ] waiver of the constitutional right to counsel in a criminal proceeding with the waiver of the statutory attorney-client privilege . . . [which] is not constitutionally guaranteed but is a statutory provision embodying the substance of a common-law rule of evidence.” (See also People ex rel. Vogelstein v Warden of County Jail of County of N.Y., 150 Misc 714 [1934]; Matter of State of Conn., 179 Misc 2d 623 [Nassau County Ct 1999].) As noted by Judge Smith, in his concurring opinion in People v Carmona (82 NY2d 603, 620-621 [1993]):
“The availability of the . . . privilege ‘depends not on the contents of the privileged communication but rather on the character of the communication, the relationship between the parties to it and the circumstances under which it was made.’ (Majority opn, at 610-611 n 2.) The Samuels/Settles[2] right to counsel, in contrast, recognizes that the assistance of counsel is essential once a criminal prosecution has been commenced because then the ‘defendant finds himself faced with the prosecutorial forces of *702 organized society, and immersed in the intricacies of substantive and procedural criminal law’ (Kirby v Illinois, 406 US 682, 689). The voluntary act of defendant in doing something adverse to the confidential ‘character of the communication’—i.e., divulging it to third persons either publicly or privately— has no relationship to the rationale for the Samuels/ Settles constitutional right, the need for protection from the ‘prosecutorial forces of organized society’ (Kirby, 406 US, at 689, supra).”
The courts of this state have “consistently exercised the highest degree of vigilance in safeguarding the right of an accused to have the assistance of an attorney at every stage of the legal proceedings against him (e.g. People v Blake, 35 NY2d 331; People v Di Biasi, 7 NY2d 544).” (People v Cunningham, 49 NY2d 203, 207 [1980].) As that Court noted:
“Our special solicitude for this fundamental right is based upon our belief that the presence of an attorney is the most effective means we have of minimizing the disadvantage at which an accused is placed when he is directly confronted with the awesome law enforcement machinery possessed by the State (People v Settles, supra, at p 161; People v Hobson, supra, at p 485).” (Id.)
“In this State, the right of a criminal defendant to interpose an attorney between himself and the sometimes awesome power of the sovereign has long been a cherished principle. . . . The right of any defendant, however serious or trivial his crime, to stand before a court with counsel at his side to safeguard both his substantive and procedural rights is inviolable and fundamental to our form of justice (see People v Donovan, 13 NY2d 148, 151).” (People v Settles, 46 NY2d 154, 160-161 [1978]; see also People v West, 81 NY2d 370 [1993].)
Indeed:
“In New York, the right to counsel is grounded on this State’s constitutional and statutory guarantees of the privilege against self-incrimination, the right to the assistance of counsel and due process of law (see, People v Skinner, 52 NY2d 24, 28; People v Hobson, 39 NY2d 479, 483). It extends well beyond the right to counsel afforded by the Sixth Amendment of the United States Constitution and other State Constitutions (see, People v Velasquez, 68 NY2d 533, *703 536; compare, Escobedo v Illinois, 378 US 478; Massiah v United States, 377 US 201; see also, 1 LaFave & Israel, Criminal Procedure § 6.4, at 468-469 [collecting cases]).” (People v Davis, 75 NY2d 517, 521 [1990]; see also People v Ramos, 99 NY2d 27 [2002].)
The “right to counsel attaches indelibly in two situations.” (People v Ramos at 32.) The first is upon the commencement of formal judicial proceedings. The second is when an uncharged individual has actually retained an attorney or, as in the matter sub judice, when such individual, while in custody, has requested a lawyer in the matter. (See People v Davis; People v West; People v Ramos.) Once attached, a defendant’s request for an attorney cannot be withdrawn, except in the presence of counsel. So fundamental is this right to our criminal jurisprudence, that this rule “is intended to provide ‘a buffer, in the form of an attorney, between [citizens] and the coercive power of the State’ at the times when ‘legal advice is most critically needed’ (People v Settles, 46 NY2d 154, 164, supra).” (People v Davis at 522.)
It is equally well recognized that this right to counsel includes a “constitutional right to confidential communication with [one’s] attorney.” (People v Gamble, 18 NY3d 386, 393 [2012].) “[I]ncluded therein, of course, is the right to consult counsel in private, without fear or danger that the People, in a criminal prosecution, will have access to what has been said . . . .” (People v Cooper at 259.)
This right to access to counsel had been extended to consultation with counsel, under limited circumstances, prior to submitting to a chemical test in a driving while intoxicated case. As the Court of Appeals explained in People v Gursey (22 NY2d 224, 227-228 [1968]), under circumstances virtually identical to those before this court:
“In light of current recognition of the importance of counsel in criminal proceedings affecting significant legal rights, law enforcement officials may not, without justification, prevent access between the criminal accused and his lawyer, available in person or by immediate telephone communication, if such access does not interfere unduly with the matter at hand. This court recently noted, in another context, that: ‘As a matter of fairness, government ought not compel individuals to make binding decisions concerning their legal rights in the enforced absence of counsel’ ” (citations omitted).
The Court of Appeals recently reiterated this limited right to *704 counsel, under similar circumstances, in People v Smith (18 NY3d 544, 550 [2012]), noting that “[w]here there has been a violation of the limited right to counsel recognized in Gursey, any resulting evidence may be suppressed at the subsequent criminal trial (id,.).”[3]
As the Court noted in Gursey (22 NY2d at 228), when the defendant was requested to submit to a chemical test of his breath he, “possessed a number of statutory options which could be asserted only during the transaction at the station house, and concerning which the advice of counsel, if available, was relevant.” While Officer Quigley properly provided the defendant with the opportunity to converse with counsel, given the fact that Officer Quigley would not step out of earshot of the conversation, the defendant was placed in the untenable position of having to either forgo providing his attorney with information essential to the advice sought, or waive his Fifth Amendment right against self-incrimination in order to exercise his fundamental right to counsel. The defendant’s Federal Sixth Amendment and New York State article I, § 6 right to counsel is entitled to more than the lip service provided herein.
Under all of the circumstances presented, if the police are not going to provide a defendant with privacy during a telephone conversation with counsel concerning whether or not to submit to a chemical test, then statements overheard by the police during such consultation with counsel must be suppressed.
Accordingly, the defendant’s application to suppress is granted to the limited extent of suppressing those statements attributed to him while he was on the telephone consulting with counsel and is denied in all other respects. The suppressed statements shall not be available to the People on their direct case at the time of trial herein if this right to counsel, particularly under these circumstances, is going to mean anything.

. Mapp v Ohio, 367 US 643 (1961); Dunaway v New York, 442 US 200 (1979); People v Huntley, 15 NY2d 72 (1965).

. People v Samuels, 49 NY2d 218 (1980); People v Settles, 46 NY2d 154 (1978).

. The court does not here address suppression of the defendant’s refusal to submit to the requested chemical test of his breath. The defendant’s refusal itself was not a subject of this hearing. Moreover, there is no dispute that the defendant did speak with counsel and refused to submit to the test, apparently based upon counsel’s advice. While this may provide the defendant with an “innocent explanation” for refusing to submit to the test at the time of trial, it is not a basis for suppression of the refusal. (See People v Thomas, 46 NY2d 100 [1978].)